IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

GREYSTONE AT AUBURN, LLC,  )
           )
    Plaintiff,    )
           )
  v.        )  CIVIL ACT. NO. 3:20-cv-00022-ECM
           )      (WO)
THE CITY OF AUBURN, ALABAMA, )
           )
    Defendant.  )

**MEMORANDUM ORDER and OPINION**

## I.  INTRODUCTION

At issue in this case is whether a contract for the purchase of land is binding on the Defendant, the City of Auburn ("the City").  Also at issue is the contract's assignment and interpretation.

In the late 2000s and early 2010s, the City built a road extension after purchasing a right of way from the owners of Lipscomb Land Company, Inc. ("Lipscomb"). Subsequently, Lipscomb sold its land to Plaintiff Greystone at Auburn, LLC ("Greystone").  Greystone believes that the terms of the City's original contract with Lipscomb apply to its purchase.  But today's City Council says the City never agreed to the transaction, the contract was not assigned to Greystone, and the contract's language is limited in application.

Now pending before the Court are the Parties' cross motions for summary judgment. (Docs. 19 and 22).[1]  The motions are fully briefed and ripe for review.  For the following reasons, the Plaintiff's motion for summary judgment, (doc. 19), is due to be GRANTED in part and DENIED in part.  The Defendant's motion for summary judgment, (doc. 22), is due to be DENIED.

## II.     JURISDICTION

The Court exercises federal subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

Personal jurisdiction and venue are uncontested.

## III.    STANDARD OF REVIEW

A reviewing court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The movant can meet this burden by presenting evidence demonstrating there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some

---

[1] The Court will refer to the page numbers generated by CM/ECF.

element of his case on which he bears the ultimate burden of proof. *Id*. at 322–23.  Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-movant must support his assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual

3

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

A reviewing court is constrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## IV.   BACKGROUND

In the 1990s and 2000s, the City of Auburn sought to build an extension of Samford Avenue, a main thoroughfare extending through the City. The City developed a master street plan adopting the extension in 1990, and the City Council broached the idea of acquiring property from Lipscomb for this extension in 1999. The effort failed. But extensive negotiations resumed, and the City Council resolved to enter into a proposed agreement on December 19, 2006. The agreement allowed the City to receive a right of way from Lipscomb. In return, the City would pay for the installment of Lipscomb's new water and sewer taps along the utility lines being built with the Samford Avenue Extension.

Lipscomb requested numerous changes to the agreement before finally signing a final agreement on August 8, 2007 ("the 2007 Agreement"). The City Manager and Mayor signed the Agreement on behalf of the City. In turn, the City Council approved the Agreement in Resolution No. 07-243 on August 21, 2007. The City and Lipscomb

memorialized the Agreement in a Statutory Warranty Deed signed on October 15, 2007. The terms of the 2007 Agreement are in dispute, but the contract, at the very least, provided that Lipscomb would gift land and easements to the City, while the City would pay for and install sewer and water taps, waive a disputed number of fees for fifteen years, and other financial obligations.[2]  The City tendered ten dollars in consideration, and built the Samford Road Extension.  The City installed fifteen water taps and fifteen sewer taps for Lipscomb's use.

Greystone is a development company seeking to build an apartment complex in Auburn.  On May 18, 2018, Greystone purchased two parcels of land containing forty-six acres from Lipscomb.  The deed included an assignment of all rights and benefits from the 2007 Agreement with the City.[3]  Subsequently, Greystone informed the City that it was entitled to a waiver of its sewer access fees, pursuant to the 2007 Agreement.  The City disagreed and refused to waive 220 access fees incurred by Greystone.  Consequently, Greystone filed suit.

---

[2]  The City charges both "tap fees" and "access fees." (Doc. 24-29).  The City charges tap fees for water lines only.  The City explains, "[t]ap fees are charged to cover some of the actual costs of [sic] incurred in physically tapping the water or sewer line. . . . The Water Works Board does still perform taps up to 2-inches and assess water tap fees based on the size of the tap made." (*Id.*).

The City charges access fees for both water and sewer lines.  The City adds, "[s]ewer access fees are one-time fees charged by the City . . . . Therefore, they are charged only to users who add a new water meter, upsize an existing water meter or, in the case of multi-unit residential developments, who add new units to the sewer system." (*Id.*).  Finally, water access fees are also one-time fees. (*Id.*).

[3] The 2007 Agreement itself provides for the assignment of the deed. (Doc. 1-1 at 5, para. 7, and at 8, para. 19).

5

# V.    DISCUSSION

Greystone alleges one count: breach of contract. (Doc. 1 at 8).  However, the City argues that summary judgment should be granted in its favor because Greystone was never assigned the contract and therefore does not have standing.  The City further argues that the contract is null and void because the Mayor and City Manager were never authorized by the City Council to enter into a binding contract with Lipscomb in 2007, and, particularly, the Mayor and City Manager were never authorized to enter into a contract which waived sewer and water tap fees. (Doc. 27 at 7–8).  The City further asserts that any approval in 2007 by the City Council is invalid because the Council did not have the 2007 Agreement for review in its meeting.[4]  In the alternative, the City argues that the 2007 Agreement is unambiguous and that the terms of the Agreement limit the amount of access fee waivers and credits. (Doc. 23 at 2).  Greystone responds that the 2007 Agreement is the binding contract in this case, it was appropriately assigned to Greystone, and it is valid and enforceable.  Specifically, Greystone argues that the City Council did not reject the 2007 Agreement and in fact adopted, approved, and performed under it for almost thirteen years. (Doc. 31 at 6).  Greystone believes the terms of the Agreement waive all access fees.

Overall, the briefings in the cross motions for summary judgment present three main issues: (1) does Greystone has standing to bring suit?  (2) Is the 2007 Agreement binding, valid, and enforceable?  And (3) is the 2007 Agreement ambiguous?  The Court will address each issue in turn.

---

[4] The City argues, "[a] copy of the Warranty Deed was not included in the agenda package, so the City Council never reviewed the deed when it took up the item at its meeting." (Doc. 33 at 5).

A.     Standing

The City argues that Greystone does not have Article III standing to bring this suit. (Doc. 23 at 2, 38).  Because a federal court must determine whether it has jurisdiction before it can proceed to the merits of a case, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020), the Court addresses this assertion first.

The United States Constitution limits federal court jurisdiction to "Cases" or "Controversies." U.S. CONST. art. III, § 2.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).  It is well settled that standing requires (1) an injury in fact, both "concrete and particularized" and "actual or imminent," (2) "a causal connection between the injury and the conduct complained of," and (3) likely redressability by the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  A plaintiff bears the burden of establishing standing through these elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, ___,136 S.Ct. 1540, 1547 (2016). "[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete *and* particularized.'" *Id.* at 1545 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)) (emphasis in original).  First, to be concrete, an injury must actually exist: it must be real and not abstract. *Id.* at 1548.  "As a general matter, tangible injuries qualify as concrete," although intangible harms can as well. *Trichell*, 964 F.3d at 997.  And, "[f]or an injury to be 'particularized,' it 'must affect

7

the plaintiff in a personal and individual way.'" *Spokeo*, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, n.1).

The City relies on Alabama contract law to argue that Greystone does not have standing because Greystone does not have privity of contract. (Doc. 23 at 40). Specifically, the City claims that Greystone was never assigned the 2007 Agreement. The City is correct that "one not a party to, or in privity with a contract, cannot sue for its breach." *Bernals, Inc. v. Kessler-Greystone, LLC*, 70 So. 3d 315, 319 (Ala. 2011) (quoting *Dunning v. New Eng. Life Ins. Co.*, 890 So. 2d 92, 97 (Ala. 2003)); *see also Twine v. Liberty Nat'l Life Ins. Co.*, 311 So. 2d 299, 305 (Ala. 1975). Thus, those in privity with a contract and third-party beneficiaries do have standing to sue. *Dunning*, 890 So. 2d at 97. A contract demonstrates intent to confer benefits on third parties when the language of the contract is "plain and unambiguous." *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So. 2d 18, 24 (Ala. 2002) (quoting *Loerch v. Nat'l Bank of Commerce of Birmingham*, 624 So. 2d 552, 553 (Ala. 1993)).

Upon review of the record, the Court concludes that Greystone was assigned the contract in this case and, therefore, does have standing. First, the 2007 Agreement intended to allow assignment and third-party beneficiaries. The Agreement reads, "this agreement shall inure to the benefit of the City, Lipscomb and all their respective successors, predecessors, affiliates, and/or assigns in interest." (Doc. 20-2 at 8, para. 19). Additionally, the City "will be responsible for all cost, if any, of Lipscomb, and/or Lipscomb's successors and/or assigns, tapping and/or accessing the water lines being built as part of the Proposed

8

Extension." (*Id.* at 5, para. 7).  The 2007 Agreement thus contemplated future assignment and was written with the intent to confer benefits on third-parties in plain and unambiguous language.

Second, the Real Estate Purchase Agreement between Lipscomb and Greystone and the Special Warranty Deed by which Lipscomb sold its land both assigned the rights to the 2007 Agreement to Greystone as an assignee and successor in interest.  The Real Estate Purchase Agreement describes the "sale of property" to Greystone, which included forty-five acres of land and "all rights, privileges, easements (including access easements, assignable permits, development rights and utility rights or capacity and appurtenances thereunto belonging . . . ." (Doc. 24-16 at 1).  The Special Warranty Deed reads,

> [g]rantor has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto Grantee . . . all those tracts or parcels of land lying and being in Lee County, Alabama, being more particularly described on **Exhibit "A"** . . . .

(Doc. 24-19 at 1).  Meanwhile, Exhibit "A" describes two large parcels of land.  "Parcel One" reads,

> [a]s to Parcel One, this conveyance is hereby made subject to all valid and enforceable restrictive covenants and easements of record applicable thereto; and *subject, also, to all valid and enforceable zoning ordinances and regulations applicable thereto so long as said ordinances and regulations remain in full force and effect, including without limitation, **all of the rights and benefits set forth and contained in that certain Agreement dated August 8, 2007**,* by and between the City of Auburn, Alabama, a municipal corporation, and Lipscomb Land Co., Inc., an Alabama corporation . . . .

(*Id.* at 4).  Thus, the Special Warranty Deed conveyed tracts of land from Lipscomb to Greystone, and, in doing so, the description of Parcel One unambiguously noted the conveyance of the rights and benefits set forth in the 2007 Agreement to Greystone. Greystone is the legal assignee of and successor to the 2007 Agreement.

As such, Greystone has established injury, causation, and redressability. *See Lujan*, 504 U.S. at 560–61.  Greystone alleges it has been injured by the City's refusal to pay access and tap fees.  Greystone points to the City's actions as the cause of its injury.  And, if Greystone proves correct, this Court may provide redress.  Accordingly, the Court finds that Greystone has Article III standing to sue for breach of contract.

### B.     Validity of the 2007 Agreement

For the 2007 Agreement to be valid, the Auburn City Council must have authorized the Agreement.[5]  A review of Alabama law reveals that this authorization may occur through (1) express authorization in a Council meeting, (2) through part performance, or (3) ratification in a Council meeting.  As discussed further below, the 2007 Agreement is binding, valid, and enforceable because all of the above occurred in this case.

#### 1.  *Alabama municipal and contract law*

In Alabama, city councils are vested by statute with significant powers.  The councils may authorize certain contracts—including land purchases—carried out by a

---

[5] The City claims that the 2006 draft agreement is actually the operative agreement, and that the 2007 Agreement contains terms never agreed upon by the City Council. (Doc. 16 at 13).  The Court disagrees. The 2006 draft agreement is nothing more than a draft, which was developed into the signed 2007 Agreement.  Therefore, Greystone is correct that the 2007 Agreement, not the earlier draft agreement, is the operative contract in this case.

mayor or city manager. Authorization occurs in two steps: (1) the city council must consider the agreement at a meeting, and (2) the council must accept the contract, whether through valid ordinances, resolutions, by-laws, or clear votes recorded within council meeting minutes. Absent express authorization, a council can create a contract through part performance or affirm it through ratification. But part performance must extend beyond merely perceiving a contract in action—the council must have involved itself in some manner to make the contract valid.

### a. Authorization

In Alabama, a city council must authorize or ratify the powers imbued in its mayor and purchases or contracts entered by its city manager.[6] Alabama statute provides that a city council has the ultimate authority to manage its City: "[a]ll legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance." Ala. Code § 11-43-43. In exercising these duties, the council prescribes powers and duties to be performed so far as those powers and duties are not set out by law. *Edwards v. First Nat'l Bank, Brewton*, 377 So. 2d 966, 967 (Ala. 1979) (citing Ala. Code § 11-43-47). And, "[i]f not otherwise provided, the council is vested with the duty to manage and control the finances and all property, real and personal, belonging to the city." *Id.* (citing Ala. Code § 11-43-56).

---

[6] The powers of a city council, mayor, and city manager are governed by statute. Accordingly, the Court should give effect to legislative intent when interpreting the statute. The Court may glean the legislature's intent from the language of the statute, the results that flow from different interpretations, the reason for the act's enactment, and the purpose of the act itself. *Trenier v. City of Prichard*, 168 So. 3d 22, 28 (Ala. 2014) (quoting *Norfolk S. Ry. V. Johnson*, 740 So. 2d 392, 396 (Ala. 1999)).

In contrast to the council, a mayor has such powers "as are conferred on him *expressly* or *impliedly* by constitutional, statutory, or charter provisions and valid ordinances, resolutions, or by-laws passed in accordance therewith." *Id.* (quoting 62 C.J.S. Municipal Corporations s 543(a)) (emphasis added). And a city manager has the power "[t]o make and execute all lawful contracts on behalf of the municipality as to matters within his jurisdiction; provided, that no contract, purchase, or obligation involving more than $100.00 shall be binding until after approval by the governing body . . . ." Ala. Code § 11-43-21(b)(7).

Thus, Alabama statute provides that the city council must authorize the city manager to enter binding contracts over $100.00 and must impliedly or expressly confer powers upon the mayor that do not already exist by statute. The case, *Town of Boligee v. Greene Cty Water & Sewer Authority*, 77 So. 3d 1166 (Ala. 2011) is instructive regarding express authorization. In that case, the town mayor entered into a contract with the local water authority for a construction project. However, it was "undisputed that the Boligee town council never authorized the agreement at issue." *Id.* at 1172. The Alabama Supreme Court reviewed the minutes from the council meetings and determined that a proposal for the general plan was presented to the council, and the council held discussions without ever deciding on the proposal. *Id.* at 1178. At least one set of minutes from the council meetings said "[n]o action" when referencing the plan. *Id.* And the "parameters of the agreement" were never even discussed at a council meeting. *Id.* at 1172. Thus, the mayor in that case was not authorized to enter a contract with the local water authority. The court found that

a mayor may enter such a contract "only to the extent directed by the city or town council." *Id.*

### b. Part Performance

A city council can also create a contract under an exception to the Statute of Frauds—part performance.  The Statute of Frauds requires sales of land to be in writing. However, a land sale contract may fall outside of the Statute of Frauds if the Parties commit part performance.  Part performance includes (1) payment of some or all of the purchase price, and (2) the buyer obtains possession of the land. *Durham v. Harbin*, 530 So. 2d 208, 211–12  (Ala. 1988) (citing *Darby v. Johnson*, 477 So. 2d 322 (Ala. 1985) (overruled on other grounds)).

In *Altmayer v. City of Daphne*, 613 So. 2d 366 (Ala. 1993), the Alabama Supreme Court considered whether a city breached its contract for the sale of real property when its city manager signed a contract and set aside escrow money for the sale, but the city council did not approve the agreement upon review.  When the city manager presented the purchase agreement to the council in a formal meeting, the council requested an appraisal of the property and then voted a week later to reject the agreement. *Id.* at 368.  Importantly, the council had only instructed the city manager to "negotiate for the property and report back to the council" regarding the search for a property to purchase, and it identified several locations which might be purchased. *Id.*  The court noted that the Statute of Frauds requires an agreement for the sale of land to be in writing and any authorization for an agent to bind a principal must also be in writing. *Id.* at 369.  However, the council never provided written

authorization for the city manager "to bind the City to a contract for the purchase of the property" in question. *Id.*

Furthermore, the council did not commit part performance: the escrow money was never tendered. *Id.* ("[B]oth the City and [the Plaintiff] claimed ownership of the funds in escrow."). The court explained, "[t]he Statute of Frauds defense may be waived when the principal commits an affirmative act showing an intention to affirm the contract . . . however, the record does not show that the City ever took such an affirmative act." *Id.* (citing *Durham*, *supra*). Without any written authorization, or an affirmative act to waive the Statute of Frauds defense, the contract was null and void. Accordingly, the court in *Altmayer* found that the city manager did not have the authority to enter the contract, and summary judgment was proper on the breach of contract claim. 613 So. 2d at 369.

In *Town of Boligee*, the court did not consider the doctrine of part performance, but it did analyze whether the defendants were estopped from denying the contract. 77 So. 3d at 1173. The court held that, even though construction commenced and was carried out for at least four years without objection, there was no evidence of misrepresentation or concealment on the part of the council. *Id.* The mere fact that the council members perceived the construction but did not nothing to stop it was not enough for authorization. *Id.* Thus, the City was not estopped from denying the contract. *Id.* From this holding, it can be taken that *active*, *affirmative* steps by a council might count as part performance.

14

### c. Ratification

The common law doctrine of ratification is also a method by which a city council may enter into a land contract. In contracts law, ratification is "[a] person's binding adoption of an act already completed but either not done in a way that originally produced a legal obligation or done by a third party having at the time no authority to act as the person's agent . . .." *Ratification*, BLACK'S LAW DICTIONARY (11th ed. 2019). Alabama municipalities may ratify an implied contract. *City of Huntsville v. Stove House 5, Inc.*, 3 So. 3d 186, 193 (Ala. 2008) (citing *Bethune v. City of Mountain Brook*, 300 So. 2d 350 (Ala. 1974)). *Altmayer* is one example of a case wherein the city council did not ratify a contract, but it demonstrates that ratification is an option for a council. 613 So. 2d at 368 ("The City thereafter rejected the purchase agreement . . . ."). If a council does ratify a contract, that ratification operates as previous authorization. 10A McQuillin Mun. Corp. § 29:112 (3d ed.). However, municipalities may not ratify an illegal contract, such as one that violates statutes. *Id.* at § 29:110.

#### 1. Application to the 2007 agreement

In this case, the Auburn City Council authorized the 2007 Agreement. It made the contract valid when it passed a resolution adopting the contract in 2007; it alternatively ratified the contract when it did so. Furthermore, the City acted under the terms of the 2007 Agreement for almost thirteen years, making the contract binding through part performance, even if it was not effectively put into writing. Accordingly, the City is bound by the 2007 Agreement.

The Auburn City Council provided express authorization to the Mayor and City Manager to execute a contract with Lipscomb on three occasions:

(1) In 1999, the Auburn City Council approved Resolution No. 99-136, voting for the Mayor to enter a contract with Lipscomb. (Doc. 20-8).[7]

(2) In 2006, the City Council reviewed an unexecuted draft agreement and passed Resolution No. 06-247, authorizing the City Manager and Mayor to execute an agreement with Lipscomb. (Doc. 16-3 at 2).[8]

(3) In 2007—after the City Manager and Mayor signed a contract with Lipscomb—the City Council voted to approve the Warranty Deed.[9]

First, the 1999 resolution specifically authorizes the Mayor of Auburn "to execute all deeds, documents, contracts, and other instruments necessary to facilitate the transaction" with Lipscomb. (Doc. 20-8).  The language of the resolution unambiguously allows for the 2007 Agreement.  Second, while the 2006 resolution is tied to the 2006 draft agreement, it also authorizes the Mayor and City Manager to enter a transaction with Lipscomb on behalf

---

[7] "NOW, THEREFORE BE IT RESOLVED by the City Council of the City of Auburn, Alabama, that the Mayor of Auburn, Alabama, be, and hereby is, authorized to execute all deeds, documents, contracts, and other instruments necessary to facilitate the transaction as contemplated by this Resolution." (Doc. 20-8).

[8] "BE IT RESOLVED, by the City Council of the City of Auburn, Alabama that the certain Agreement marked 'Exhibit A' attached hereto and made a part hereof by reference by and between the City of Auburn, Alabama and Lipscomb Land Co., Inc. is hereby duly accepted and approved and that the Mayor and City Manager be and are hereby duly authorized, directed, and empowered to execute the Agreement for and on behalf of the City of Auburn." (Doc. 16-3 at 2).

[9] "NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Auburn, Alabama, as follows:
    That the City of  Auburn does hereby accept the Warranty Deed from Lipscomb Land Co., Inc. to be used as right-of-way for the East Samford Avenue Extension Project." (Doc. 20-3).

of the City. (Doc. 16-3 at 2).  This suggests that the 2006 resolution may also allow for the 2007 Agreement.

But even if neither the 1999 nor the 2006 resolutions by the City Council were sufficient under Alabama law, the 2007 resolution is a clear authorization of the 2007 Agreement.  Alternatively, the 2007 resolution is a ratification. *See City of Huntsville*, 3 So. 3d at 193.  Unlike in *Town of Boligee*, where the Council minutes showed that the Council repeatedly decided not to take action regarding the land sale, 77 So. 3d at 1178, the Auburn City Council reviewed and affirmed their desire to purchase a tract of land from Lipscomb.  In fact, the Auburn City Council specifically voted for the 2007 resolution.  By comparison, in *Altmayer*, the Council asked for an appraisal of the land in question and rejected the sale shortly thereafter. 613 So. 2d at 368.  Whereas here, the Auburn City Council explicitly voted to affirm the land sale, ratifying the actions of the Mayor and City Manager.

Furthermore, despite the City's claims of inadequate opportunities for review of the 2007 Agreement by the Auburn City Council, nothing in the Alabama Code provides that a City Council *only* may authorize a contract after reviewing the exact Warranty Deed by including it in the agenda package.  The Code requires approval by the Council for a City Manager to enter a contract over $100.[10] Ala. Code § 11-43-21(b)(7).  The Mayor has powers granted by the Council. *Edwards*, 377 So. 2d at 967.  Such approval could easily come in the form of a meeting vote, ordinances, resolutions, or by-laws.  No statutes or

---

[10] Even though the City only tendered $10 in consideration in this case, the cost of covering sewer and water fees brings the amount at stake in the contract well over $100.

cases presented by the City—nor any located by the Court—provide that the approval cannot be based on an agenda item summary.  In fact, such a limitation imposed by the judicial branch could force undue burdens on city councils.

Moreover, part performance would also make the 2007 Agreement binding.  The City operated for almost thirteen years under the 2007 Agreement: it received the land for which it tendered payment of $10, constructed a road, and paid for some of Lipscomb's water and sewer fees.  The Council's actions in this case are far more affirmative and concrete than the actions of the councilmembers in *Town of Boligee*, who knew a construction project was happening but did not participate in it.  *See* 77 So. 3d  at 1173.  Consequently, the doctrine of part performance affirms the existence of a contract.

Quite simply, the City's claim that the 2007 Agreement is null and void does not pass muster.  Alabama law allows a Mayor and City Manager to enter a land purchase contract upon authorization by their City Council.  Here, the Auburn City Council authorized, ratified, and performed under the 2007 Agreement.

Accordingly, the Court finds that the 2007 Agreement is binding, valid, and enforceable.  Greystone's motion for summary judgment will be granted insofar as the Court finds that both Parties are bound by the 2007 Agreement.

### C.    Whether the 2007 Agreement is ambiguous

Now that the Court has found the 2007 Agreement to be valid, binding, and enforceable, it turns to the contract terms themselves.  Unsurprisingly, both Parties argue

that the 2007 Agreement is unambiguous. They just think its language has different meanings.

When interpreting a contract under Alabama law, a reviewing court initially should stay within the four corners of the contract.  The court may discern the intent of the contracting parties from the whole contract, even when interpreting a specific clause. *Gulf Coast Realty Co., Inc. v. Professional Real Estate Partners, Inc.*, 926 So. 2d 992, 1002 (Ala. 2005).  Further, "whenever possible, effect must be given to all [the contract's] parts." *Id.* at 1004 (quoting *West Town Plaza Assocs., Ltd. v. Wal-Mart Stores, Inc.*, 619 So. 2d 1290, 1294 (Ala. 1993).  If the court finds that the terms of the contract are unambiguous, then the court will enforce the contract as written. *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000).

But if the court instead finds that the terms are ambiguous, the court will then use rules of contract interpretation to resolve the ambiguity.  In doing so, the court may look to the "circumstances attending its execution and the subsequent acts of the parties" to determine the parties' intent. *Gulf Coast Realty Co.*, 926 So. 2d at 1005 (quoting *West Town Plaza* Assocs., 619 So.2d at 1294).  "Under those established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms." *Homes of Legend, Inc.*, 776 So. 2d at 746.  And when an inconsistency exists between two clauses, "the inconsistency must be resolved in favor of the prior clause, unless an intention to

thereafter qualify is plainly expressed." *Id.* (quoting *City of Fairhope v. Town of Daphne*, 282 Ala. 51, 58 (1968)).  Finally, if the ambiguity cannot be resolved, it "must be construed against the drafter of the contract." *Id.*

The 2007 Agreement is ambiguous as to the amount of access and tap fees the City should waive.  The 2007 Agreement provides in part:

> The deeding, gifting, donating of the Lipscomb Land Gift Property unto City shall be for the sole purpose of the construction, by City, of the Proposed Extension, together with the necessary and appropriate improvements, including but not limited to the sanitary sewer and water lines, *access to said sanitary sewer and water lines by Lipscomb* to be provided by fifteen (15) water taps (up to one inch) and fifteen (15) sewer taps, and other improvements . . . .

(Doc. 20-2 at 4, § 3) (emphasis added).  The Agreement further reads,

> Said sewer taps and water taps shall be constructed during the construction of the Proposed Extension and once the Proposed Extension has been constructed, City shall have no further obligation hereunder regarding sewer taps and water taps except for the additional sewer taps described below along an existing sanitary sewer line . . . . . However, City shall pay on behalf of Lipscomb unto the Auburn Water Works Board or other appropriate entity, the cost of Lipscomb to tap said water lines. City further agrees that irrespective of the costs of the tapping of said water lines by Lipscomb, that City will be responsible for all costs, if any, of Lipscomb, and/or Lipscomb's successors and/or assigns, tapping and/or accessing the water lines being built as part of the Proposed Extension. City's obligation to pay and/or waive these water tap fees, whether tapped during, and/or after construction of the Proposed Extension, shall end on the 15th anniversary of this agreement.

(*Id.* at 5, § 7).  From the above language it can be taken that the City agreed to build fifteen water taps and fifteen sewer taps along the Samford Avenue Extension for Lipscomb.  It can also be surmised that, in § 7, the City agreed to pay the costs of "tapping and/or accessing the water lines being built as part of the Proposed Extension" until the fifteenth anniversary of the Agreement. (*Id.*).  Both Parties agree that these fees can only come from the fifteen water taps and fifteen sewer taps the City built according to the 2007 Agreement.

However, the Parties disagree over the amount of access fees due to be waived.  They dispute whether the language in the contract requires the waiver of (1) *exactly fifteen* sewer access fees or (2) *any* sewer access fees and water access fees sprouting from one of the already existing water lines.  Greystone asserts that the 2007 Agreement means the City will waive *any* access fees to the taps. (Doc. 32 at 18).  Specifically, Greystone seeks a waiver of the 220 access fees that stem from the fifteen taps built according to the Agreement. (Doc. 31 at 15).  Greystone points out that the contract limited the physical taps to fifteen, but it did not place any numerical limits on the access fees. (Doc. 32 at 18).  According to Greystone, "[a] single sewer tap can provide service to multiple units; therefore, multiple access fees may be assessed even though a single physical tap is used." (Doc. 31 at 15).  Greystone thus believes the 2007 Agreement waives both the water access fees *and* sewer access fees.[11]

---

[11] One brief submitted by Greystone reads, "[t]he City breached the 2007 Agreement by failing to pay the Auburn Water Works Board all water access fees." (Doc. 31 at 12) (emphasis removed).  But another one of Greystone's briefs reads, "Greystone contends that the 2007 Agreement obligates the City to waive all sewer access fees to any of the sewer taps that were physically constructed during the construction of the Samford Avenue Extension." (Doc. 32 at 26).

The City argues that Greystone's interpretation would be wholly unreasonable based on the plain language of the contract:

> [u]nder [Greystone's] interpretation, the financial obligation to the City is literally unknown and the number of access fees unlimited. But if this is how the agreement is to be interpreted, why would the parties tie access fees to the tap fees and related taps being constructed under the agreement? Why not just state that the City will waive all sewer access fee without any qualification?

(Doc. 33 at 15).  The City argues that the 2007 Agreement means that the City will only waive fifteen sewer access fees in total, but it will not waive any water access fees. (Doc. 23 at 30) ("[I]ts unambiguous meaning is that the City agreed to waive 15 sewer access fees and no water access fees.").  The City applies *expressio unius est exclusio alterius* to argue that, because the contract does not contain the phrase "water access fees," but it does mention "sewer access fees," the exclusion of the phrase should be interpreted as a purposeful decision. (Doc. 33 at 13–14).

Through these arguments, the Parties present more than one reasonable interpretation of § 7 revealing an ambiguity.  Accordingly, the Court looks beyond the four corners of the contract to determine the intentions of the original signing parties.  Greystone presents evidence that the 2006 draft contract had language specifically limiting the access fees to just the fifteen being built. (Doc. 20-11 at 8).  However, the draft language was removed, suggesting that the City and Lipscomb did not want that language to remain and instead wanted the City to pay for any access fees placed on the new lines.  The 2006 draft agreement also thereby included sections about waiving access fees, meaning access fees

were specifically contemplated. In fact, the attorney who negotiated the contract for Lipscomb stated that the City had agreed to waive all sewer *and* water access fees for fifteen years. (Docs. 20-33 at 34, 69, 91, and 96). And Nimrod Lipscomb, the individual tasked with handling Lipscomb's transaction with the City, testified in his deposition that fee waivers were an important consideration in negotiations: "[t]he access fees and just getting fees waived is pretty big." (Doc. 24-24 at 16). Most compelling of all, the evidence shows that the City and Lipscomb operated under the Agreement for thirteen years.

The City offers evidence to suggest that the intent of the parties was not to waive all access fees, but only fifteen sewer access fees. First, the City Manager who signed the 2007 Agreement, City Manager Duggan, testified in his deposition that the contract did not include either water access fees or sewer access fees. (Doc. 20-6 at 8–9) ("It was not a discussion of access fees when this line was entered into this document."). He also added that when the 2006 draft was edited to become the 2007 Agreement, there were not any substantive changes, (*id.* at 11), and that the City had no power to waive water access fees—only the Water Board had that power, (*id.* at 17). When Greystone requested a waiver from the City in 2019, City officials interpreted the contract to provide for "a waiver of fifteen sewer access fees and reimbursement for fifteen water access fees." The City also claims that Greystone is not even using the same physical water taps that were installed under the 2007 Agreement and, thus, there can be no breach based on the language of the contract. (Doc. 33 at 13).

In sum, the Parties present two different reasonable interpretations of the Agreement and two different versions of the signing parties' intentions and the circumstances that resulted in the 2007 Agreement. *See Gulf Coast Realty Co.*, 926 So. 2d at 1006. Consequently, both Parties cast doubt on the other's interpretation. The Court therefore finds a genuine dispute of material fact as to the meaning of § 7. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586. There is a genuine dispute of material fact as to whether the contract waives (1) no access fees, (2) just sewer access fees, or (3) both sewer access fees *and* water access fees. There is also a genuine dispute of material fact as to how many of those access fees are waived. Neither Party is entitled to judgment as a matter of law, and both motions for summary judgment will be denied as to the interpretation of the contract itself.[12]

## VI.   CONCLUSION

In sum, the 2007 Agreement is a valid, binding, and enforceable contract between the City and Lipscomb's assign and successor, Greystone. But the contract's interpretation—and the City's corresponding duties—will be left for trial.

For the reasons as stated, and for good cause, it is

ORDERED as follows:

1.      The Plaintiff's Motion for Summary Judgment, (doc. 19), is GRANTED in part, and the Court finds that the 2007 Agreement is an enforceable contract.

---

[12] The City also claims that Greystone is not even using the original fifteen water taps that were installed under the 2007 Agreement and, thus, there is no breach. (Doc. 33 at 13). This is another dispute of fact.

2.      The Plaintiff's Motion for Summary Judgment, (doc. 19), is DENIED regarding the terms of the 2007 Agreement itself.

3.      The Defendant's Motion for Summary Judgment, (doc. 22), is DENIED.

4.      On or before **September 27, 2021**, the parties are DIRECTED to file a notice with the Court identifying an agreed upon trial date utilizing the undersigned's trial terms which can be found on the Court's website.

DONE this 13th day of September, 2021.


                    /s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE